Good morning. May it please the Court, Joan Levy appearing on behalf of the defendant appellant in this case, Sean Kane. Good morning. Good morning, Counsel. The issue that I think brings us here to this Court today has to do with the evidentiary problems that arise from the intersection of Federal Rules of Evidence 602 dealing with inadmissible lay evidence, lay opinion evidence, and the Federal Rule of Evidence 701, which limits opinion evidence. And as those two rules really intersect as well with Rule 403 dealing with, given the business leading to the jury, in this particular case, well, Federal Rule of Evidence 602 requires that the testifying witness must personally observe the fact that's in issue, and with 701, any lay witness opinion must be, A, rationally based on perception of the witness, on his perception, and it must be helpful in determining a fact in issue. And the fact in issue in this case, it's really very simple. It's a whodunit. It's who was the assailant in this cage of six inmates. Now, with respect to 602, the witness that's – that we see primarily as the witness that maybe pushed the evidence over into what caused the conviction of Mr. Cain was Lieutenant Cole, who was the special investigator at the Atwater prison. Let me ask you this. Is your argument that Inspector Cole – that the record doesn't show that Inspector Cole had the knowledge that would allow him to identify the defendant? Correct. He didn't have the personal knowledge and, as well, the security contacts. But you're not arguing that if Inspector Cole, for instance, had seen this witness every day, you know, knew him as well as he knew his brother, that then the testimony would be – you're not arguing in that case it would be improper? Yes. I think that if this witness was a guard, let's say, that had daily contact with Mr. Cain, then the judge – then he would have sufficient knowledge of his appearance, his build, all of that. The issue you're arguing is that the record doesn't support a ruling that the witness had sufficient knowledge of the defendant to be able to testify and identify him. Could you repeat that for me, please? I'll try. Okay. Your argument is that the record does not contain sufficient evidence that the witness had adequate knowledge, familiarity with the defendant to be able to testify as to – and to identify him. Yes. Plus, from my observation of the videotape, at the time that he identified him, he identified Mr. Cain from the rear of Mr. Cain, so that even if he had seen pictures of Cain or had very casually seen Cain in passing, I mean, he really didn't have a look at the face of the person who he said was Mr. Cain. Okay. Maybe we're not at this point yet, but the whole point is that he must know more than the jurors know regarding the identification. Otherwise, the jurors can make the same conclusion from the tape, right? Well, respectfully, I don't agree with that. No, no, I don't think you're disagreeing. I think what Judge Rustami was saying was not that he actually knew more, that he is required to know more. It is his job to know, at least on paper, all of the inmates. No, no. No, no, no. This is about whether lay, my question was about the admissibility of lay opinion testimony, and if it's helpful to the jurors, it would be admissible. Oh, correct. If he doesn't know any more than the jurors, there's no point in getting his opinion. So that's why we're concentrating, I was concentrating on, does he know more than the jurors? And it seems to me it's quite possible that somebody would know, even from the their shape, there's something about them that could, it's possible for that person to identify that person. However, if he doesn't know the person more than the jurors do, his opinion's not going to be helpful. So I guess what Judge Reinhart was concentrating on, and what I am, is, is there enough in the record to indicate that his testimony would be helpful because he knows enough more about the jurors, about this witness than the jurors do? Well, I think that the record, the transcript is really silent as to how he knows. Let me add to that question. Is it enough that he know more than the jurors, or is there a minimum level of knowledge he would have to have so that he would be able to identify the person? Yes. I think that he would have to at least be able to demonstrate that he's had face-to-face interaction. And then beyond that, I think what that interaction consisted of would be important because we would want to know, you know, was he one-on-one, was he focusing on this person's face or build, or was it, you know, was it sitting down, or you'd just, you know, get a head start. And we have a record as to what he knew about the defendant. There may be arguments on what the testimony means, but there's not a lot of testimony. It's a very finite, small quantity of testimony. And how do you construe the guard's testimony as to his prior contact with the defendant? What do you think it states? Well, I'm not satisfied from reading the transcript, which I've read several times, quite a few times, that it was established that he ever actually personally met with Cain. He talks about his usual procedure, and it is certainly part of his job and his job description to meet with as many of the inmates when they first come into Atwater as possible. I think the testimony was that there were 1,600 inmates in the prison, and in the Shoe area where Mr. Cain was at the time of this attack, there were, I think, 135 to 140, something like that, inmates. But he testified to the fact that he wasn't there every day, you know, that he did have absences, there was a lieutenant who would sit in for him when he wasn't there. He did not have his records with him. His records were not part of the evidence at trial to show that he ever actually did see Mr. Cain. He said he didn't know that he was there that day. Then came the question, how many times in the time prior to June 27th and the time my client got there had you spoken with him in person? It would be a minimum of at least two times. I think that's the testimony that we deal with. Well, you know, to quote former President Clinton, it depends upon what is, is. When he uses the phrase, it would be, he also talks about his usual practices. He talks about the fact that when inmates come in, that's one – that's one interaction that he has, that's one conference, and then there's often another, a second. But that's not saying that he did, in fact, meet with Mr. Cain on one or two occasions. And in fact, when defense counsel asked him if he knew the dates of those meetings, he couldn't provide her with that or the time, you know, or the time frame when it occurred. He said twice that it's in my records, I didn't bring the records with me, the records are in my office. I could get you that information. But with the burden being on the United States, on the government, that's something that we believe the government should have brought in to prove that there was at least some contact. He also said that his contacts were averaged 5 to 10 minutes or 5 to 15 minutes. So if there were two contacts, you average it out, it's a total of about 10 minutes that he spent with Mr. Cain. And I would submit to the Court that that is just not sufficient contact in a prison environment where so many of these inmates, they're all tattooed, many of them have shaved heads, they have goatees. I think that there really is a very valid argument to be made that mistaken identity can occur unless you're truly familiar with the person, you know something about the personality, as you said, the way that person walks, the kind of an attitude that's shown. None of that was brought out in the trial. There was really no demonstration in the trial of why Lieutenant Cole was so sure that that person was Mr. Cain. And at the end of his testimony, he did, in fact, say, you know, I am certain it was him. But I would argue that, just based on the photographs that we submitted to the Court of the inmate, Sonny Day, and the inmate, Sean Cain, that there's a tremendous resemblance, you know, in their features, their face, their style. And I would say that the evidence in this case was extremely weak, that Lieutenant Cain should not have been admitted by the court. I see that my time is up, and I didn't leave time for rebuttal. Well, all right. We'll give you a minute or two for rebuttal. Okay. Thank you, counsel. If the Court has no more questions, I'll turn it over to the plaintiff's counsel. Good morning. My name is Kevin Rooney. I was trial counsel. The Bett case lays out the test, and it's cited in the brief. The Court's familiar with it. There's a couple of things I wanted to touch on with regard to counsel's argument about the identification. One, to step back for a minute, this is a unique crime. It's – it takes place literally in a cage. There's one person who's attacked, five people who could have done it, a universe of five suspects. And there's a camera that records the whole thing. The contention that the lieutenant who provided the identification of who the attacker – well, it wasn't the identifier, but who identified the defendant in the videotape, identified him from the back is somewhat misleading. The witness testified that he had reviewed that tape approximately 30 times. And the question was, as someone is depicted coming into the cage, the angle of the camera is such that if someone walks into it there initially, their back is shown. That's – who's that? It's clear the witness has seen the whole – the whole video, and the person's eventually going to turn around. So the idea that the identification is strictly from the back is based on that one second of tape I think is misleading. The witness had seen the entire tape. The witness's familiarity, it's clear in the record, is based on some interviews with the defendant. Kennedy, where – tell me where in the record it says some interviews with the defendant. It says that he had spoken with him at a minimum of two times. Yes. What I'm referring to is the quote, the court has said. That quote – the statement I read you, how many times in the time prior to June 27th, in the time my client got there, had you spoken with him in person, it would be a minimum of at least two times. Is there anything other than that one statement? About the interviews with the defendant. About having seen the defendant. Other than that he interviews people generally when they come in, but he doesn't know whether he interviewed the defendant. Right. That's what I was going to refer to. So there's – that says he doesn't know whether he interviewed the defendant. All there is, is this one statement, it would be a minimum of at least two times that he spoke with him. What there is, and you're correct, Your Honor, we – you – we may disagree with the import of the record, but you're correct as to what the record is. Okay. So there's no statement that there were interviews with the defendant. There's no statement of – that he spent more than ten seconds with the defendant on either of those two times he spoke with him. There's no indication of what speaking with him meant, whether it means he walked by him in a line of 100 people and said hello. All we know is that sometime he spoke to him at least twice. Correct. And he probably spoke to him another time. And then what's – Well, he didn't say that, though. He just – and it seemed to me, I mean, I don't know what your view of this is, but even when he said he met with him a minimum of two times, wasn't he really talking about his practice rather than his recollection? I don't see anything in here where he says I remember him well. He was talking about I would have met with him a minimum of two times. The way I took that was it was a minimum of two times. What this Court's got is a cold record. And what we're looking at is an abuse of discretion standard. And that's, of course, important to remember. The – perhaps the most significant thing, though, is the – And then he says, generally, the interviews are anywhere between 5 and 15 minutes. So that indicates to me he doesn't have a recollection of the interview. He's talking generally. And that's the interview with each inmate that comes to the institution. He doesn't know if he did that or not. And then after that, he says he doesn't know whether he did that or not. Right.   have a recollection of the interview. But what Judge Thomas is saying is that if you read the two would-haves together, it may be that he was talking about a practice rather than an actual recollection. Yeah. We're looking at an abuse of discretion standard. But I want to turn to another thing in the record that I think is important. May I ask you about what the district judge was doing there? The district judge said, I'll allow it, you know, and I expect you to lay a foundation. And then at a later part, the judge just stops it. As if the judge has decided that, well, maybe he made a mistake and there's not enough foundation now. No. I think what the judge was saying, what he didn't want to do was overemphasize it. The tape is before the Court. The Court has, as a part of the record in this case, the – and I'm calling it a tape – was actually digital. There's a point where the – You mean that's CD? Yes. That's been submitted to this Court counsel in a motion. Is that what the jury saw? Yes. That CD? Yes. And it, of course, varies with how you play it, the computer you bring it up on, how good it is or not. But it's a relatively good, good visual depiction. The Court – I don't want to stand here and tell you – I don't know how we would quantify good or bad, but you – Does the record reflect what kind of machine it was played on for the jury and how it was situated? No. I'm sorry. It does not. I don't think there's anything specific in the record. But we don't really know what the jury saw. You've got the CD. You don't have the – But we don't know what it looked like. You can – the only thing you can do is, circumstantially, of course, you can hear what counts or argue and you can see it. And then, of course, the standard of review is, could any rational jury from these facts have reached this verdict? But what you're saying is it's hard for us to tell what the facts are without knowing what it was played on. If you look at it on a normal computer in your office, you couldn't tell anything. I couldn't tell anything from a net. The courtroom and perhaps – I don't know if we want to – what we want to do with regard to the district court's thing. It was the district court's machinery that's in that courtroom that's provided to all counsel. It was good. It wasn't like a Hollywood picture. Is this an electronic courtroom where the jurors have a little screen or not? No. There was a big – there was a big screen behind the fence table. Such as a normal television screen? No. No. Bigger than that square behind this bench here. Wide and big. I was very, very roughly estimating 15 feet wide, 9 feet high. Maybe not that high, but I would say at least 15 feet wide. Nice. Maybe the size of the decorative stonework behind the bench here. The point at which the district court wouldn't let the identification be made, there's four inmates walking in a line up and down. They're just walking up and down this cage. And their backs are to the camera, and the man on the far left peels off and attacks a man who's sitting or squatting on the far left wall of the cage. And I stopped the presentation and asked the witness, who's the man on the far left? And I asked – and you'll see in the record, I say, let's call them shapes, 1, 2, 3, and 4. Who are these people? And the court said, no, I'm not going to permit you to make that identification. You've already identified these people once. The jury will have to figure it out from there. The – but to return to the familiarity with this defendant, of the witness, the most significant thing, I would suggest in the record, is that this inmate was one of the 135 or 140 inmates in the secure housing unit, and the witness testified that he went through and explored what was going on with each of those witnesses in a week – each of those inmates in the SHU in a weekly meeting. Every single week, he went through what was going on with those people. And that's – that's what's in the record, and that's at Reporters' Transcript 240. The witness testified on the record that he went through and explored what was going on with each of those inmates in the SHU in a weekly meeting.  And he knows who these people are. He's familiar with each of them, and then he said he could identify each and every one of those people. He testified to that at Reporters' Transcript 240. Yeah. The fact is, I guess, that the jury probably saw the defendant a lot more in two or three days of trial than the witness did, right? I think there's two things I want to touch on that. The Beck case says that the extent of a witness's opportunity to observe the individual before the identification goes to the weight of the testimony, not its admissibility. And I think the issue here is, was his testimony properly admitted? Did the district court abuse its discretion, allowing this witness to say, I know this defendant, I recognize him, this is who are the people in – that are depicted in this computer thing, this computer image? Another thing is that this witness has some special skills in his work, and he talks about that in his testimony. Every single day, he uses the computer, the computer imaging, the computer surveillance system. He's familiar with it, and he's got a skill at recognizing people based on that computer, that computer imaging. I realize the Court has said, well, we played it, apparently you played it on your own computers and couldn't tell much. I think, one, the presentation to the Court was much better, and, two, we do have a witness that was familiar with this defendant and is also very, very adept at using this. I see my time's up. I'm happy to address any other issues. Kennedy, you said, was Beck the case you said you think is controlling? Yes. And so the fairly simple question would be to determine whether the facts here are sufficient to meet the standards set forth in Beck. Well, Beck is the controlling case, yes. And Beck talks about the witness's familiarity with the defendant's appearance at the time the crime was committed, his familiarity with the defendant's customary manner of dress. That should not be too difficult here. And whether the witness knew the defendant over time and in a variety of circumstances such that the witness's lay identification testimony offered to the jury a perspective it could not acquire in its limited exposure to the defendant. Right. That's page 10 of my brief. Okay. Yes. Thank you. And if I might, the witness's familiarity with those weekly meetings, the witness's meetings with Mr. Cain and the witness's familiarity with the digital surveillance system I think meets that final criteria very plainly. Okay. Thank you. I'll try to be very, very quick. Mr. Rooney stated that he viewed the tape, Cole viewed the tape 30 times. It's also in the record that Mr. Cole did not view the tape until after he had been told by other officers who was in the cage. So he, when he initially saw that what was on the tape, he already had a preconceived idea. He certainly, the universe had been limited to these five people. And so if you get an idea in your head and then you watch the tape 30 times, it would seem to me you're just reinforcing that initial opinion. Also the context, even assuming. Why does not all go to the weight rather than, why does not all go to the weight rather than admissibility? I mean, the jury knew the limitations of his experience with the defendant. If that were it alone, I would probably tend to agree with you. But I think it all harkens back to the sufficient contacts. You know, we go back to that. And even if we assume for the sake of argument that he did meet with Cain two times, one or two times, he meets with them when they first come in and there was testimony that Cain had been. We don't know that that's one of the terms. Well, his usual practice is to meet when they first come in. So that would have been two years ago if he in fact met with him at all. That would have been two years ago. And then there was testimony that there was a second or that there would have been a second, but there was no testimony as to the time frame of that. So if we look at the usual practice and say, well, okay, let's say there was this one meeting when Cain first came in. That was two years ago. And as far as we know, that would have been the only in-face contact. He didn't provide any recollection of concrete facts pursuant to Beck regarding the identity of Cain. The weekly status meetings, Cain was not present at them. And I don't care how familiar he is with computer technology and the digital system and viewing digital images. There was no evidence that any of those digital images had Cain on it, first of all. And second of all, it's not a substitute for seeing someone in person, you know, warts and all. And with respect to Beck, in the case of Mr. Beck, the witness had met with the defendant four times in a two-month period for a total of 70 months, and that did establish sufficient contacts. Even if we were to say that there were two contacts with Cain, it would have been over a two-year period for about 15, 20 minutes, if that. I don't think those two are analogous at all. And furthermore, in Henderson, a similar case dealing with this issue, the law enforcement officer knew the defendant for four years and saw him more than 100 times, and that established sufficient contacts. And I think that, you know, the very last point that I want to make is that even if we were to say that this was admissible evidence, I think it still has to be weighed under 403 because of the nature of Cole's work. Undue weight was given to his background and experience in law enforcement. I mean, he was a very credible person as far as what he did, and so perhaps the jury gave more weight to who he was than what he actually saw or could have seen on the videotape. And so it would seem to me that the probative value of his testimony is greatly outweighed by the unfair prejudice of who he was. After all, the victim was a witness, and the victim merely said that he had an argument over a ballgame with Cain. The other four inmates were not brought in as witnesses. They were there. They were percipient, but they don't – we don't know what they would have said. They may not have wanted to be involved. They might have said, we don't know, we don't know. But whatever they would have said, they wouldn't have had the credibility of Cole, who had been in law enforcement for 17 or 18 years. He was – he worked for the Air – he was in the Air Force. He, you know, he had this aura of high moral authority attached to him, which was very persuasive and, I think, unfairly prejudicial. Thank you, counsel. Thank you.
judges: Reinhardt, Thomas, Restani